Argued and submitted July 22, 1983, reversed and remanded January 18, 1984

STOWELL,
*Appellant,*

*v.*

R.L.K. AND COMPANY et al,
*Respondents.*

(A8202-00608; CA A26586)

WILSON et al,
*Appellants,*

*v.*

R.L.K. AND COMPANY et al,
*Respondents.*

(A8202-00609; CA A26587)
(Cases Consolidated)

675 P2d 1074

Jeffrey M. Batchelor, Portland, argued the cause for appellants. With him on the briefs were Robert E. Maloney, Jr., Scott P. Monfils, and Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Peter C. Richter, Portland, argued the cause for respondents. With him on the brief were Norman J. Wiener, and Miller, Nash, Yerke, Wiener & Hager, Portland.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

YOUNG, J.

## YOUNG, J.

These consolidated cases involve similar actions for "conversion" and "interference." Plaintiffs' complaints allege that defendants, who operate the Timberline Lodge ski resort, sold plaintiffs passes that entitled them to daily ski lift tickets. The complaints then allege that defendants refused to issue the lift tickets. Defendants moved for summary judgment on the ground that a previous action between the parties was *res judicata.* The trial court granted the motion and entered judgment for defendants. We decide that defendants are not entitled to summary judgment as a matter of law and reverse.

The facts that gave rise to the previous action took place between April and June, 1977. Plaintiffs Wil L. Wilson and Wil L. Wilson and Barbara Wilson, dba Wilson Farms (Wilsons) purchased ten "Club 2000" passes from defendant R.L.K. and Company (R.L.K.) for $2,000 each. During the same period of time, plaintiff Stowell purchased three passes for $2,000 each. Each pass entitled the owner to two lift tickets each day from the purchase date through the year 2000. Plaintiffs purchased the passes, intending to sell lift tickets to the general public. In January, 1978, R.L.K. notified plaintiffs that they would no longer be permitted to sell daily lift tickets, but that they would be allowed to use the passes to obtain lift tickets for noncommercial uses, *i.e.,* their personal use or to give away. R.L.K. alternatively offered to repurchase the passes for their original price.

In January, 1979, plaintiffs filed separate lawsuits against defendants, charging breach of contract and fraud. The Wilsons alleged $920,000 damages for lost profits; that allegation was based on defendant Kohnstamm's pre-sale representation that each of Wilson's ten passes was worth $92,000. Stowell's alleged damages were $276,000, based on estimated profits lost from the sale of lift tickets from his three passes. The cases were consolidated for trial, and the jury awarded the Wilsons $42,500, and Stowell $12,700 in damages. On August 18, 1982, we affirmed the judgment of the trial court without opinion. *Stowell v. R.L.K. and Company; Wilson et al v. R.L.K. and Company,* 58 Or App 749, 650 P2d 1098 (1982).

Plaintiffs filed the present actions against defendants in February, 1982. The complaints allege that R.L.K. offered

to sell plaintiffs the passes—which were the subject of the first case—and that acceptance of defendants' offer entitled the plaintiffs to "provide/loan lift tickets to friends, business associates or members of the public on a daily or other basis, as plaintiffs might choose." The complaints also allege that plaintiffs accepted the offer in reliance on defendants' representation that the passes could " "* * * be loaned on a daily basis or week or month or however you wish.' "

The complaints then allege R.L.K.'s conduct after the judgment in the first case, and plaintiffs' resulting damages. The first claim is:

"VI.

"In the fall of 1981, defendants interfered with plaintiff's [sic] ownership rights and refused to deliver daily lift tickets to plaintiffs.

"VII.

"As a result of defendants' actions, plaintiffs have been unable to acquire possession, control or use of personal property to which they are entitled under the terms of the agreement, defendants having interfered with said rights in personalty, to which plaintiffs have a lawful and legal right of possession, control and use.

"VIII.

"Said conduct has interfered with plaintiffs' ownership rights in personalty to plaintiffs' general damages of $10,000."

The second claim is:

"XI.

"Defendants converted plaintiffs' ownership and rights to obtain and use nine of the ten memberships all to plaintiffs' damages in the sum of at least $90,000."[1]

Plaintiffs essentially argue on appeal that their current claims could not have been litigated in the previous cases, because defendants' conduct that gave rise to the claims did not occur until after judgment in the previous actions. This argument proceeds from the premise that plaintiffs purchased from defendants several discrete rights embodied in the

---

[1] The allegations are taken from the complaint filed by plaintiffs Wilson. The same allegations appear in the Stowell complaint except for the difference in the number of memberships and the amount of damages alleged in paragraph XI.

passes: first, a personal right to the use of the lift tickets; second, the right to give the tickets away; third, the right to sell the entire pass; and, fourth, the right to sell individual lift tickets off the passes. Plaintiffs argue that, at the time that the previous action went to trial, defendants had breached only the fourth of these divisible rights and had expressly represented that the rights to use or give away the tickets, or to sell the entire passes, would continue to be honored.

In support of the summary judgment, defendants point to the fact that plaintiffs' complaint in the prior action alleged damages for each pass in the sum of $92,000, which was the sum allegedly represented by defendant Kohnstamm to be the full value of the pass. They further argue that the only "probative evidence" in the present case is plaintiff Wil L. Wilson's testimony from the previous case:

"Q. Were you permitted to * * * use any one of the passes for your own personal use?

"A. [WILSON]: No, I wasn't. Several times I went to the window when I was on a ski bus so I didn't have to pay to get tickets for my wife and myself and they wouldn't even let me use them for that day."

Defendants contend that, because plaintiffs' first action was for the full value of the passes, and because plaintiff Wilson admitted that he was denied personal use of the passes, plaintiffs' claims arose prior to and were actually litigated in the first action.

Having asserted *res judicata* as a bar, defendants have the burden to prove its application. They must show as a matter of law that plaintiffs' first action forecloses their attempt to bring the present action. *See Seeborg v. General Motors Corp.,* 284 Or 695, 699, 588 P2d 1100 (1978). We hold that the record does not, as a matter of law, preclude the present action.

The doctrine of *res judicata* defines a "claim" or "cause of action" as an aggregate of facts entitling a party to some form of relief. *Troutman v. Erlandson,* 287 Or 187, 201, 598 P2d 1211 (1979). The doctrine applies, not only to those matters actually determined, but also to those matters which might have been determined as incident to a claim or defense. *Waxwing Cedar Products v. Koennecke,* 278 Or 603, 610, 564

P2d 1061 (1977); *Western Baptist Mission v. Griggs,* 248 Or 204, 209, 433 P2d 252 (1967). The former judgment therefore merges all claims against the defendant arising from the transactions that were at issue, irrespective of whether plaintiff had asserted those claims in the previous actions. *Rennie v. Freeway Transport,* 294 Or 319, 323-24, 656 P2d 919 (1982). In the present case, as in many cases, it is difficult to determine the extent of the operative facts giving rise to the previous action. The Supreme Court has stated, however, that the number of operative facts that should be viewed as included within a single cause of action must be determined pragmatically, on the basis primarily of practical trial convenience considerations. *Dean v. Exotic Veneers, Inc.,* 271 Or 188, 193, 531 P2d 266 (1975), *quoting* Clark on Code Pleading 127 (2d ed 1947).

■ ■     With respect to continuing contracts, the rule against splitting a cause of action does not prevent the bringing of successive actions for successive breaches of the same contract when the contract is not terminated by a single breach and each suit is brought after the subject breach but before a subsequent breach. *See* 4 Corbin, Law of Contracts § 954 (1951); *Bolte v. Aits, Inc.,* 60 Hawaii 58, 587 P2d 810 (1978). However, if at the time an action is commenced for a specific breach of a separable and divisible contract, there exist other breaches of that contract which are not so independent of each other as to constitute separate and distinct causes of action, they are all parts of one indivisible demand and must be included in the action or be barred. *See Bolte v. Aits, supra,* 60 Hawaii at 60.

■     In plaintiffs' first actions the jury returned verdicts for breach of contract in plaintiffs' favor. The breach consisted of defendants' past and current failure to perform their obligations to honor the lift tickets resold off plaintiffs' passes as well as defendants' anticipatory breach of its future obligation to continue to honor the resale of tickets off the passes. There is nothing in this record that shows that before the commencement of the first action plaintiff Stowell was aware of defendants' breach of their duty to provide lift tickets to Stowell or to his guests. Defendants merely assert that plaintiffs sued for the full value of the pass; it is not clear, however, whether the "full value" as alleged represented the resale

value only, the personal use value, the gift value or the value of the three combined uses.

With respect to plaintiff Wil L. Wilson, his testimony that he was denied personal use of the tickets—which defendants assert is the only "probative" evidence in the case—accounts only for those potential breaches that occurred before the time of the first trial. Unlike defendants' anticipatory repudiation of plaintiffs' right to sell tickets, there was no evidence that defendants anticipatorily repudiated the balance of plaintiffs' contractual rights personally to use or to give away the lift tickets. On the contrary, defendant Kohnstamm continually represented that plaintiffs' rights to use personally or to give away tickets would continue to be honored. On January 28, 1978, he wrote to plaintiffs, stating that, although defendants would no longer issue lift tickets pursuant to the passes if the tickets were to be resold to others,

"* * * [t]his does not affect the resale of the pin (membership) on a permanent transfer basis which you are free to do at any time and as stated in the brochure, nor does it affect the privilege which you have of letting your friends or business associates to use your membership on a daily basis."

Additionally, defendants' trial memorandum in the former action defined the nature of their breach of contract:

"* * * It should be made clear that plaintiffs still retain all rights in their Club 2000 passes except the right to resell tickets. They can still sell the entire pass (probably at a profit), transfer the passes by will or by giving away the right to use the pass on a daily or other basis or use the passes themselves."

In closing argument to the jury, defendants' lawyer explained:

"* * * Please remember this in your deliberations that if plaintiffs get any money in this case what will they have? Number one, they will get to keep the money they made from the sale of Club 2000 tickets * * *. In addition to that they get to keep their Club 2000 passes. They have not asked in this lawsuit to give their passes back. To rescind the agreement is a legal term, they have not asked for that. So if you pay them any money in this lawsuit they get to keep the money they made from the sale of the tickets, they get to keep their Club 2000 passes. The Club 2000 passes can be resold. * * * Plaintiffs will also get the right to use those passes or to give them away to their friends or relatives. Plaintiffs also have the right

to redeem their passes, that is, turn them back in to the company. * * *"[2]

Those statements by defendants demonstrate that they purported to intend to continue to honor the passes for plaintiffs' personal use. Although defendants breached their obligation to allow plaintiffs to sell lift tickets and had anticipatorily repudiated the balance of that obligation, the record raises an unresolved issue with respect to the balance of plaintiffs' right to use or give away the lift tickets or to sell the passes as a whole. It was error to grant summary judgment.

Reversed and remanded.

---

[2] The court instructed the jury:

"The plaintiffs in this case purchased their Club 2000 memberships for the purpose of reselling lift tickets to obtain a profit. Under these circumstances, I instruct you that the fact that a profit would be made in this transaction was reasonably within the contemplation of the parties at the time these agreements were entered into. Therefore, in determining damages to be awarded plaintiffs, I instruct you that you must consider the consequential damages which have flowed from the breach. Those damages include the gains and profits which you find the parties reasonably would have made had the breach not occurred. In other words, the plaintiffs are entitled to be placed in the position as nearly as possible in which they would have been placed had defendants not breached the contract. I used the word 'defendants,' I mean the defendant corporation."